Forty-two feet. Next case is Lucent Technologies versus Gateway and Dell and Microsoft. The gang's all here. You don't get 30 minutes aside here. 2007-15-46, Mr. Taranto. Thank you, Your Honor. If I could, I would like to begin with the 08-0 patent and the ownership issue on which the district court relied entirely to set aside the jury verdict of non-infringement. I think the district court committed two kinds of errors. One, an error in deciding what the consequences would be if claims 2 and 4, 2 or 4, of the original 938 incorporated new work. And the second, in characterizing the evidence on which the jury decided that neither claim 2 nor claim 4, in fact, incorporated new work. And if neither of them do, then we don't reach the ownership issue. If neither of them does, then the entire patent, the 938, involves existing technology, or at least doesn't involve new work, which is the critical question, and then the consequences of a divided assignment would not be at issue. But what the JDA does in a case, now I'm going to assume for a minute that claim 2 or 4 does incorporate new work, is to separate the assignment of new work and the preservation of existing technology. That is what Pope decided a hundred and more years ago, and this court has repeatedly said, a kind of attempted assignment that is not permitted under the patent laws, and the patent laws, by virtue of Pope, have said for more than a hundred years what the consequences of that kind of attempted assignment is, which is only a license, not ownership. That was the fundamental legal error that the district court committed. That the district court simply misread Israel bioengineering, because Israel bioengineering is a case in which ownership started divided and never came together. Is it your view that you concede then that the JDA does provide for joint ownership? Your argument is simply that Pope doesn't allow that, so we have to go into the assignment issue, right? Or are we disputing, or is your argument that the JDA doesn't necessarily provide joint ownership? The JDA does provide for joint ownership of new work. The question is what happens if in a single patent there's new work and not new work, which includes existing technology. But under your guise, under new work, that new work would not be jointly owned, and you concede that the JDA does provide that new work is jointly owned. That's right. It would mean that Fraunhofer has, by virtue of the sentence that comes immediately after the ownership sentence, not only has a license, the ability to use and the ability to license everybody else. But you would read out of the JDA the provision that says that the new work now will be jointly owned. Exactly. In exactly the way that the Supreme Court said in Pope, there was a provision that said, I think it was Claim 2, was going to be assigned, ownership was going to be assigned, and the Supreme Court said, you can only assign, you cannot only assign Claim 2, and when you try to assign only Claim 2, what you are conferring is not an assignment of ownership. So it overrides the contractual attempt to assign a partial ownership and says the result is a license. Would the consequences of your reading of the agreement plus Pope be that if Fraunhofer had some existing work of its own and some new work, and Fraunhofer were the first one to the patent office, that it would have had the same rights that you now claim that Lucent had in the new work? That is to say, it would have had the entitlement to single possession of the patent. I'm not sure. In other words, are we talking about, does the consequence of the agreement plus the Pope case mean that whoever is first at the patent office gets the advantage of possession of the new work? If I understand the question, it would depend on who was legitimately first at the patent office, who the inventor was, and if the inventor was properly Dr. Brandenburg at Fraunhofer or somebody else at Fraunhofer and they legitimately got a patent, then ownership starts with the inventor, and then the question would be presumably the Fraunhofer employee inventor would have an assignment agreement to Fraunhofer and then the JDA would operate perfectly symmetrically to attempt to confer ownership of whatever was new work on AT&T. So everything here is perfectly symmetric. The only aspects of the JDA that are relevant here in general that are not symmetric are slightly different provisions having to do with control of existing technology. AT&T didn't get any kind of sub-licensing rights roughly to Fraunhofer's existing technology. Fraunhofer did get some sub-licensing rights to AT&T existing technology, but everybody agrees now, not applicable here. So Fraunhofer couldn't sub-license existing technology here. But as to the new work provision, Section 3, it's perfectly symmetric as to the two parties. And as I recall, so then you're still left with Israel. So your argument is that Israel is somehow different than Pope or different than this case because Israel is inventorship and not ownership? No, no, because Israel starts with joint inventorship. And so when you start with joint inventorship, you start with joint ownership. Israel involved a situation where one of the owners brought a suit and the problem was the other owner had never lost ownership and you can't do that. But the other owner was not the inventor. Yes, he was. Absolutely was. Absolutely. I thought Rubenstein was the inventor in that case and Yeda was the owner. No, no. The opinion is clear on every single page Microsoft cites that there were co-inventors with different owners because they had each assigned rights to different owners. And the problem was that there was another owner whose ownership had never been transferred. But the separate ownership started as separate ownership. Here what we have is ownership in the patent that starts with sole inventor, with Johnson as sole inventor. He has an agreement with AT&T that says... So why is that, I mean leaving aside Pope and you're saying because we have to reconcile it with Pope, but why is that distinction relevant for any reason other than Pope? The distinction you're drawing between this case and Israel. Yeah, I'm not sure I can put aside Pope because the problem is what this case involves, the JDA, is precisely the Pope situation where somebody starts with a consolidated ownership and tries to assign part of it. And the law for a hundred and some years has been you can't do that in these circumstances. And when you try to do that, no ownership is assigned. That is the first argument about the JDA. It's entirely dependent on Pope. And the net result of this, of course, is that Fraunhofer gets to use Newark, gets to license it freely to everybody else, but he doesn't get control over AT&T's existing technology. And the JDA took great pains, as Microsoft itself said in its JML motion, as the district court agreed, not only to try to confer joint ownership in Newark, but to preserve individual ownership in existing technology. The result of the district court's opinion is to give Fraunhofer control over something that the JDA intended to keep. Well, she found, is this a she? It's the other case. In any event, the trial court found that subject matter claim four was new subject matter, and that was placed by means of the CIP in the early case, which might otherwise have been solely an early invention of AT&T. Did I get it wrong? I'm not sure I follow entirely. The district court disagreed with the jury determination about claim two and claim four. And as to each of those, the jury found that there was no element of either claim two or four required by post-April 1989 work. That's the test, right? Is an element required by post-April 1989 work? That's when Brandenburg came over to AT&T and started working on the project together. The district court said, you're wrong about that. You, the jury, cannot find that. Now, as to claim four in particular, we think that the jury was perfectly entitled to find that, and that the district court committed its error by ignoring the really quite crucial evidence about what James Johnson actually built to conduct his listening tests. He built a device using Alliant and, I think, DG computers actually to listen. That's what we're talking about now, the listening device, right, the decoder. And there was ample testimony that the very large-scale integrated hardware, VLSI hardware, is such a broad term that a jury is perfectly entitled to decide that what Johnson actually used to listen, provided the structure described in his technical memorandum in these listening tests to see if the sound was any good, was, in fact, pre-April 1989 work, in fact, pre-1988 work. So we think the district court just got that evidentiary characterization wrong. Similarly, but somewhat different analysis for claim two as to the modified discrete cosine transform, where, again, there is both expert testimony about what a person of skill in the art would have understood to be within the inventions, and also Johnson's own testimony that he read of the MDCT, the modified discrete cosine transform, before April 1989, from which the jury could infer, even if this were the right inquiry, that he contemplated using the MDCT as one of the frequency transforms which his 1988 application, the 598 application, described quite generally. The first claim in the 598 application is perfectly general as to frequency transforms. Let me make one other point. This is not an issue in which the question would be possession in the written description sense. This is a contract question about what is new work. Now, to be new work, you have to not be a number of things. You have to not be Fraunhofer's existing technology. You have to not be AT&T's existing technology. And you also have to not be anything in the public domain before April 1989. To be new work, you have to be post-April 1989, or I guess post-March 1989, and the result of work done jointly. Everything else is excluded. Can I go back to the joint ownership issue just before your time runs out? And that is, Pope says you can't start splitting out claims for patent. That part of this would be satisfied by what the judge did here, right? Because the consequences of what the judge did here says we can't be splitting out claims two and four from claims one and three. The difference you have with this case and the reliance on Pope comes not from that principle, right, but simply from what Pope then did to alleviate the problem in that case. Is that correct? Exactly right. Pope does two things. He says you can't have certain kind of divided assignments. Right, and that principle is one that is consistent with what happened in this case. But it also says what the consequence is, and the district court picked the wrong consequence. The Supreme Court said 100 years ago, the consequence is not that ownership is transferred in everything, but rather that ownership is transferred in nothing, and what's transferred is a license interest. I am into my rebuttal time. Can I ask one more quick question? And that's there's a footnote in your brief that I don't think the other side responded to, and it kind of got my attention. One could call it the $750 million footnote, because what it says is what I think it says, so I want to clarify it, is that if we agree with you on the 80 patent, then even if we disagree with you and agree with the judge on the 457, you still win everything in terms of damages, assuming we agree with the damages and all the issues with respect to those damages. That's right. And that is because? Because every item that infringes the 457 also infringes the 080. It's not true in reverse, but it is true in that direction. And so what happened here, I mean, the split is sort of the black box issue? Actually, I don't think it's a black box issue. Microsoft agrees that the only evidence on how to do these damages was the jury actually said we're going to use a 0.5% rate. The numbers, the number of computers and their average value is undisputed. Microsoft explicitly agreed at trial that these numbers are correct. And so all the jury did was it multiplied 0.5% times the average price of the computer times the number of the computers. And divided by two. And divided by two. You think they should have written 1.5 in both boxes? Yeah. On the understanding that it wouldn't be cumulative. Yes, yes, and there was some discussion about the verdict form before the verdict form was sent in about this issue. And everybody, the judge kind of said, well, it really doesn't matter how it was written. In retrospect, it looks like it does. Right, although there's several Supreme Court decisions and other decisions that say if you can only make sense of the jury verdict in one way, you really do have to make sense of it that way. And there's no other way to make sense of it. Thank you. Thank you, Mr. Toronto. We'll give you your two minutes back. Mr. Gottman, you wanted to save a couple of minutes, but that's only response on the trust issues if there's something to respond to. That's correct, Your Honor. May it please the Court. I want to respond to the very last point on the footnote just briefly. The numbers actually by the jury were 769 on each patent. So it would require a reformation of the actual verdict to get to the result, which Lucent advocates. Secondly, just because we're in this area, it is also important to note for the Court that there's only one decoder claim in this case, and that is Claim 4 of the 080 patent, and the decoder allegation on damages is much larger in time, 97 up through the end of the case, whereas the allegation on the encoders doesn't start until 2004. That's something that may or may not become relevant depending on how the Court decides the issues. I just wanted to point it out. So I would like to begin with the 080 patent as well, and in particular address the preexisting AT&T work point. There were a few things that I disagreed with on counsel. The issue under the JDA is whether the work had been done by AT&T prior to April 1989. It's not whether it had been done by somebody else. It's not whether it could have been done by AT&T. It's what did AT&T itself do? In other words, that was existing information. Correct. What did AT&T itself put together? And if you look at the MBTC claim, for instance, and you look at the testimony which was relied upon by the District Court, which is at A1475-76, you will see with absolute clarity that Mr. Johnston had not done MDCT using the limitations of Claim 2, including all of them, until after, in his own words, he sat down with Carl Heinz Brandenburg, the so-called father of MP3, after the April 1989 JDA was in place and learned how to use that, which became the subject of the 938 patent. Wait a minute. How do we know your first premise, which is the previous work? Everything that's not new work is just what is limited to what AT&T did. How do we know that? Good question. The contract answers that for you. Because if you look at the definition of pre-existing work in the contract, and I can give you an A-site for that. 24610? Yes, sir. Thank you very much. It says existing technology is the results of work, and then it goes on to effectively say done by AT&T and done by Fraunhofer. And so what AT&T could have done, pre-existing, is not the issue. The issue is what AT&T did. And then it lists in the various attachments to the JDA the work that had been done by AT&T and the work that had been done by Fraunhofer. And so there was an interesting argument in the, I may get the color wrong, I think it's the yellow brief, that we had, quote, admitted something by saying that MDCTs were old. That's not the issue. The issue is did AT&T itself put together Claim 2 prior to April of 1989? And the testimony makes it absolutely clear, as Judge Brewster clearly recognized, AT&T itself did not do it. It's not a question of what a person of ordinary skill could have done knowing what AT&T had done. And this came up in the earlier argument just preceding me. The issue is what AT&T did. And Mr. Johnson made it absolutely crystal clear that he didn't even know how to do that until he learned about it from Mr. Brandenburg after the JDA was in place, after he arrived, and taught him how to do it in 1989. The second part of this is Claim 4. And if you look carefully at the Alliant Computer testimony, which was cited and is intended to support Claim 4 being pre-existing work, what you'll see is it's just general testimony. This is the VLSI issue? Yes, Your Honor. Go ahead. It's the VLSI as well as the DSP. And what you'll see is, sure, there's some testimony about an Alliant Computer. It's being discussed as if it's 1985 or 1986, which is prior to any alleged conception of the stuff in Claim 4. And you'll see that there's no nexus between the general discussion of the Alliant Computer and the Alliant Computer actually doing the method steps in Claim 1 or Claim 2 or actually performing the steps that are necessary, the functional steps in Claim 4. So while you can talk generally speaking about an Alliant Computer and you can have some guesswork as to whether an Alliant Computer has VLSI in it, which frankly is not supported by this record, and you can have guesswork about whether it might have had a DSP in it, which is not supported by this record, what you cannot possibly conclude from this evidence of record is that it was running the algorithms of Claim 1 or the algorithms that are necessary to be done through the functions of Claim 4. And so that's what Judge Brewster got absolutely clearly correct. There's not a bit of testimony from Mr. Johnson, who was at trial, that he did that. There's not a bit of testimony from Dr. Giant, their own expert, that he used the Alliant Computer to do that. Nothing. Not one centella. And so when Judge Brewster did his thorough and well-reasoned opinion in this case, he studied the evidence and he concluded that those generalities were not enough. And frankly, they weren't even relied on at the JMAL stage, but they're relied on here through sort of documentary reinterpretation after the fact. So the evidence of record is clear that Claim 2 was not done by AT&T prior to the JDA or prior to April 1989, which was when Dr. Brandenburg arrived, and that the work in Claim 4 was not done by AT&T until after Dr. Brandenburg arrived in April 1989. What do you think the parties were attempting to achieve with respect to the prospect of patent applications with this agreement? Well, I think the JDA says it. And also there's the declaration. By definition, I guess that we'd have to conclude that that's right. But what do you think it says about what they were trying to achieve? With patents? It says that when they got new patents after they signed this agreement and after Dr. Brandenburg arrived, that basically the road was clear. They didn't have to worry about each other. And the reason that it says that is it talks about new work. You said that the road was clear. I mean, what do you mean? They didn't have to worry about each other, and they would jointly own the work. But do you think they contemplated that those patents might also include claims that encompassed prior non-new work? Absolutely. They had to. And it would all be jointly owned? Yes, because the new work paragraph in the contract talks about patents. It could have talked about claims. It could have said you own some claims, I own others. It could have done something like that, but instead it didn't. It talked about patents that were new work. And it not only says it in that clause, but a couple of paragraphs later, I think it's the one that talks about the patent applications and who can prosecute them. It is very clear that the new work was discussing patents and what happened to patents. And there's nothing inconsistent with giving those jointly to the parties because that's what that new work paragraph says. And I wanted to go back to a question that you raised earlier, Judge Bryson. And you said, you know, is it like a rush to the patent office? I mean, if you think about the consequences of using the agreement in the way that Lucent wants, which is frankly contrary to the evidence of record because we've also cited in our exhaustion papers the testimony of the head of licensing from Fraunhofer, so I would encourage you to look at that as well. But think about it. What if it was one claim in the patent that was Fraunhofer's and one that was Lucent's and then one that had been jointly developed together? What would happen then? Who would own it? The only thing that makes any sense is the result that Judge Brewster reached, which is when they're doing new stuff and it ends up in an application, and if they're not doing new stuff, each party can decide not to put it in an application. Lucent made its own bed here. If it's got new stuff in it, it's in a patent application, the contract squarely addresses that and says that's jointly owned. So what about Pope? I think Pope is totally consistent with us. Well, how is the result in Pope, which is that we have to license it and that we can't divvy up the claim and therefore the consequence of that is that you have to license rather than give ownership interest? How is that consistent with what you're advocating here? Pope explicitly says we can do exactly what Judge Brewster did here, and I can't give you the page number quote, but I can tell you it's on the left-hand column. There are three things you can do. One of them is convey a divided interest in the whole, and that's basic patent law, and that's what this JDA does. The JDA doesn't split up claims, which Pope said is forbidden. Pope says you can convey all the interest to somebody else in the whole patent, or it says you can convey an undivided interest to somebody else so that you jointly own, and that's all this is. This is perfectly on all fours with Pope, not to mention Israel Bioengineering, which was 90% the same situation. You've got a JDA. You've got a claim that's allegedly preexisting work. You've got another claim that's after the JDA expires. There you have two different claims jointly owned, perfectly consistent with the vast majority of the joint development agreements in existence. And so Judge Brewster's result not only comports with the language of the contract, but it's the only thing that makes any equitable sense in this case. That's what I'm trying to figure out how this works from the equitable point of view. What you're saying then is that after the time, anything, once they began working together under the terms of this agreement, then any invention, even if Fraunhofer didn't contribute anything to the invention, any patent flowing from this subject matter would be jointly owned. Yes. So Fraunhofer, simply by signing the agreement, has full inventorship rights in any patent in this subject matter. Isn't it interesting that it says that? And that's what tells you why it's so important. Well, that's the question. No, it clearly does say that. Because it basically says that new technology is treated as new. It defines new work. Find the paragraph. It is paragraph three. And it says new work is work done, first of all, exclusively by AT&T. That's three little i. And then it goes on to say new work is stuff that's done exclusively by Fraunhofer. And then it goes on in the later paragraph and it says all new work is joint work. So the agreement is crystal clear that it intended broad joint ownership because it's basically saying, hey, Fraunhofer, we don't care if you do it all on your own. It's jointly owned by AT&T after this agreement. Is this agreement still in effect? I may have been confused with another case. This agreement was for a short term and then it was extended indefinitely. You got the right dish on. Okay. It's still in effect. It's still in effect. It's still in effect. I can give you a cite for that. Do you make any, is there a difference in the JDA, the way you use the language to use the results of the new work? Is there any significance to attach the word the results? I mean, for instance, to use such new work. Would there be a difference definitionally in that phrase versus to use the results of such work? If you're asking about the scope of what that means, our view is that using the results means you can make, use, and sell, and license the intellectual property which results from that. Particularly when it follows a sentence that says we'll be jointly owned. Correct. Correct. And we've explained that part of my expression ad nauseum in our briefs. As long as it's just an expression. So I think given my time constraints, I wanted to mention that we believe on the 457 that this case is directly controlled by this court's precedence in ACCO, Dynacor, and EPAS. They admit on page 18 at line 10 of their yellow brief that the Windows Media Player does not necessarily use the HQ, and they admit that they have proven no specific instances. And that's what this court's precedence require. ACCO, Dynacor, EPAS. Consistently. And the court in each of those cases found as a matter of law no infringement, and the court was presented with arguments in each of those cases that circumstantial evidence was good enough. And in each of those cases, articulating the exact same rule, the court said that theories and hypothetical scenarios are insufficient. You have to show at least one actual use. Well, that's really not, that really isn't your position, is it? I mean, suppose that what they showed was they couldn't show that there was actually one use, that is to say, to display that on June 15th, 2006, this happened. But they could show that 30% of the time, just to pick a number which happens 30% of the time, the HQ did run. You wouldn't be standing up here arguing if they hadn't shown infringement. I would be arguing on the facts of this case, contrary to what they say in their brief, that it was not impossible. Because an expert never said it was impossible to do it. What he said, give me just a second, I'll give you the quotes. He said, if he built an apparatus to instrument the system, meaning to make it fail, to get HQ to go, then we would have said that he exaggerated the frequency. So he just decided, I'm not going to do it. He never said it was impossible for him to demonstrate it. He said it was very difficult. That's in their blue brief at Note 7. And he said it was not particularly practical. So he never said it was impossible. That's a word that shows up in their brief. In fact, it is impossible, because HQ never runs, because we actually, ourselves at Microsoft, tried to make it run, as the unrebutted testimony shows from Mr. Jones, before it was ever accused by them. And if the court wants me to respond, to point out in their footnote where they said we didn't take it out before it was accused, I can give you the actual sites, where you can decipher the truth on that. But we tried to make it run using this industry standard tool, the Visual Studio Debugger, and we couldn't make it run. And that's what software engineers could do. Dr. Polish never even tried. So I hope I've responded to the court's question. I think what you're really saying is, they didn't give, the evidence did not provide a percentage. We don't know whether it is 30%. Your evidence suggests that it's not. But the argument is, it happens, it could happen. We just don't know whether the could happen is 10 to the minus 19th, or 1 over 3. They didn't even give a theory for a percentage, Your Honor. Nor did they give a theory for how often things could occur. Nor did they ever verify that the things which leveraged into their theory would ever occur. So hopefully I've answered the question. Thank you, Mr. Gottman. Thank you, Your Honor. And whether we give you time back depends upon whether you have something to respond to on your class appeal. Mr. Toronto has, we'll give you three minutes. Thank you. Let me, I guess, start with the 457. Microsoft's position at trial was not that the percentage, the probability of the HQ running was too small. It was, it never ran. We had ample circumstantial evidence that it did run. The fact that it was designed to run. The fact that it would be called in a variety of circumstances where errors made the default encoder, which is the fast encoder, not run. There was a vigorous debate between the experts about whether circumstances that would cause failure of the fast encoder would also cause failure of the HQ encoder. I think the only thing I need to say about that was that this is a classic dispute among the experts. And our expert, Dr. Polish, answered everything that Dr. Strawn had said. When Microsoft did take the HQ encoder out, first of all, that shows it could have done it, but it kept it in for three, four years before eventually taking it out. And second, when it did take it out, it had to make a variety of adjustments to make sure that it wasn't being called. There was, and Microsoft's programmers in a white paper on its website indicated the kinds of errors that caused the fast encoder to fail are the kinds of errors that do in fact occur in practice and a programmer should take account of, all of which is enough for the jury to conclude that the HQ encoder does run, which was the only question, not how much, just ever. Let me go back to the 080 if I may briefly. What the JDA says is to be owned under the ownership provision, it has to be new work. Let me repeat what I think I said in my opening argument. That doesn't simply exclude AT&T existing technology. It also excludes Fraunhofer existing technology, and it excludes anything else that wouldn't be jointly, at least work after March of 1989, starting in April of 89. This is not a question about what James Johnson or AT&T themselves possessed before April of 89. Now I stress that only to make the point about what Section 1 of the JDA says. You have to get into the category of new work. I don't mean for one second to take away from the evidence that the jury could conclude that Claim 2 and Claim 4 did in fact come within any kind of possession or results concept of existing technology. But to be new work is a narrower category than not to be AT&T existing technology. One final point, if I may, on ACCO. Very brief. Very brief. I think ever since the Supreme Court at least said back in Cohen against Virginia, it is a mistake to take a statement made in an opinion, like a statement in ACCO, to read it outside the context of the opinion to stand for a general rule that it couldn't support, especially when it would in fact conflict with Moleculon, Chuminata, the cases that the recent decision by this Court in Symantec cited for the sufficiency of circumstantial evidence. Thank you. Thank you, Mr. Toronto. Mr. Gartman has a couple of minutes just to respond on the cross-field issues, which I guess is what, 745? No, that wasn't. 457. That wasn't infringement? That wasn't a cross-field. I don't think there was anything raised on the cross-field. My colleagues tell me nothing to respond to. That is correct. Thank you for shedding light on this loosened case. And we'll take it under advisement. Thank you.